# United States Court of Appeals
### For the Eighth Circuit

_____

No. 19-3385
_____

United States of America

*Plaintiff - Appellee*

v.

Dionandre Ganter

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City
_____

Submitted: January 13, 2021
Filed: July 1, 2021
_____

Before LOKEN, GRASZ, and KOBES, Circuit Judges.
_____

LOKEN, Circuit Judge.

A jury convicted Dionandre Ganter of being a Felon in Possession of a Firearm (Count One) and Receipt of a Firearm While Under Indictment (Count Two) in violation of 18 U.S.C. §§ 922(g), 922(n). The district court[1] sentenced him to 120

_____

[1]The Honorable Stephen R. Bough, United States District Judge for the Western District of Missouri.

months imprisonment on Count One and a consecutive 60 months on Count Two. Ganter appeals arguing (i) there was insufficient evidence he possessed a firearm; (ii) the district court violated his constitutional right to self-representation when it coerced him into waiving that right by denying a last-minute trial continuance of "at least a few months"; (iii) the district court erred during jury selection in striking for cause the only two African American prospective jurors; and (iv) the district court imposed a substantively unreasonable sentence. We affirm.

## I. Sufficiency of the Evidence

We review the sufficiency of the evidence *de novo*, viewing the evidence and credibility determinations in the light most favorable to the jury's verdict and reversing only if no reasonable jury could have found the defendant guilty. United States v. Thibeaux, 784 F.3d 1221, 1223-25 (8th Cir. 2015).

Kansas City Police Officer Daniel Ambrose testified that on March 22, 2017, a dispatcher reported a "shots fired" call at a specific address involving a black male wearing a dark shirt and khakis with an injured arm who possessed a firearm, a black male with unknown clothing, and a black female with a white shirt. Arriving in the area, Officer Ambrose saw a black man, later identified as Ganter, with a bandaged arm wearing jeans and no shirt and carrying a firearm three blocks from the reported address. Watching until backup arrived, Officer Ambrose saw Ganter place the firearm in a flower pot, an observation confirmed by Ambrose's dash camera video. Ambrose saw no other individual approach the flower pot.

When backup arrived, Ambrose told Sergeant Jeffrey Duer there is a black handgun in the flower pot. Ambrose proceeded to take Ganter into custody, while Duer watched the flower pot. The dash camera recorded Ambrose telling Ganter he saw Ganter drop a gun in the flower pot and the officers will find it. Ganter replied: "If you can find it, you can find that one. If you think you can find it, find it." A

third officer, Adison Waterman, testified he retrieved the firearm from the flower pot and photographed it, following evidence retrieval protocol, but did not test it for fingerprints. Waterman testified that Government Exhibit 1 was the firearm he recovered from the flower pot, the specific Smith & Wesson firearm the indictment charged Ganter with unlawfully possessing. Officer Ambrose testified that Exhibit 1 is "consistent with the firearm [he] saw the defendant place in the flowerpot."

After Ganter's arrest, Detective Frank Rorabaugh collected and listened to Ganter's taped jail calls, which were admitted into evidence and played for the jury. In one call, Ganter says "they caught me with one of those pistols," "I'm a felon with a gun," and "I got caught with a gun." At the close of the prosecution's case, the district court denied Ganter's motion for judgment of acquittal. Ganter introduced no evidence, relying on cross-examination of the police officers and the lack of fingerprint evidence to cast reasonable doubt on the government's case.

On appeal, Ganter argues there was insufficient evidence he possessed the firearm found in the flower pot because the government's evidence failed to establish that the firearm Officer Ambrose testified he saw in Ganter's possession was the same firearm recovered by Officer Waterman from the flower pot, the specific firearm Ganter was charged with unlawfully possessing. Therefore, he argues, the government must rely on a theory of constructive possession, which fails because mere proximity is insufficient. We disagree.

We have consistently upheld felon-in-possession convictions where the jury credited an officer's testimony that he saw the defendant possess the firearm. E.g., United States v. Shepherd, 284 F.3d 965, 968 (8th Cir. 2002). Moreover, "there is sufficient evidence . . . where a gun was immediately recovered from the location where the defendant was observed dropping something." United States v. Nickelous, 916 F.3d 721, 724 (8th Cir. 2019). Here, Ambrose testified he saw Ganter place in the flower pot a firearm that matched the description of the firearm officers found in

-3-

an immediate search of the flower pot, which was the firearm charged in the indictment. The officers' testimony combined with the dash camera video and audio recordings and Ganter's statements in the taped jail call provide overwhelming evidence that Ganter actually as well as constructively possessed the firearm in the flower pot. The district court did not err in denying Ganter judgment of acquittal.

## II. Right to Self-Representation

Trial was originally set for June 12, 2017. Lisa Nouri was appointed to defend Ganter in September 2017 after the Federal Public Defender's office withdrew because of a conflict of interest. The defense was granted a total of six trial continuances. On October 1, 2018, trial was reset for May 6, 2019 on an Accelerated Trial Date basis. On March 20, 2019, Ganter filed a *pro se* motion for new counsel, claiming a complete breakdown in communications because Nouri would not file his *pro se* motions. On April 1, after an *ex parte* discussion with Ganter and Nouri, Magistrate Judge Lajuana M. Counts denied the motion for new counsel. At the start of a pretrial conference on April 16, three weeks prior to trial, Magistrate Judge Counts asked, "Ms. Nouri, you will be defense counsel?" Nouri responded:

> That is correct, Your Honor, except Mr. Ganter has informed me prior to court . . . that he has now decided to go pro se. I told him that that was certainly not a wise decision and all the reasons why. But rather than continue, I would just let you question Mr. Ganter with regard to that statement.

Magistrate Judge Counts then asked Ganter if he wanted to represent himself. Ganter said yes. Magistrate Judge Counts stated, "it's your right, and you can go pro se if you want to, but I'm telling you this [trial] is going on the May 6th docket." The court then engaged in a lengthy colloquy, advising Ganter of the advantages and disadvantages of self representation so the court would be "satisfied that you're doing

this knowingly and voluntarily." After explaining the many reasons self representation was a bad idea, the court asked:

> The Court: So, do you still -- I'm asking one last time -- do you still desire to represent yourself and give up your right to be represented by an attorney?
>
> Ganter: Yes.
>
> The Court: And your decision is entirely voluntarily?
>
> Ganter: Yes.
>
> The Court: All right. All right. The Court finds that you, Mr. Ganter, that you're knowingly and voluntarily waiving your right to counsel. I will, therefore, permit you to represent yourself.

The court appointed Nouri as standby counsel. Moments later, with the court addressing pretrial and trial issues, Ganter requested a continuance "of at least a few months" to prepare for trial. "That would be to look at this whole case, the in and outs." Magistrate Judge Counts, noting the case "has been lingering for a while" with Nouri working on it, denied the oral motion, as it had warned. Ganter responded:

> Okay. Well, if that's the case, you might as well just let Ms. Nouri take care of my case then, since, I mean, you're not granting none of my motions for me. Maybe you might grant something for her.

After reiterating that the case would remain on the May 6 trial docket, the district court confirmed that Ganter was now knowingly and voluntarily requesting that Nouri represent him at trial "not [as] standby counsel but as your full counsel." The court then stated, "All right. So, Ms. Nouri, you're back on as trial counsel." Ganter did not appeal this ruling to Judge Bough, and the trial proceeded accordingly.

On appeal, Ganter argues the denial of his oral motion for a continuance unconstitutionally coerced him into relinquishing his right to represent himself at trial. See Faretta v. California, 422 U.S. 806 (1975). Ganter likely waived this contention by not appealing the ruling by Magistrate Judge Counts to the district court. See United States v. Kelley, 774 F.3d 434, 438 (8th Cir. 2014). But in any event, it is without merit. The Sixth Amendment "right of self-representation is not . . . a license not to comply with relevant rules of procedural and substantive law." Faretta, 422 U.S. at 834 n.46. A district court has "broad discretion in deciding whether to grant or deny a motion for a trial continuance." United States v. Myers, 503 F.3d 676, 680 (8th Cir. 2007), cert. denied, 552 U.S. 1212 (2008). We have affirmed a district court's denial of a continuance when the *pro se* defendant "was merely seeking to delay his trial again by filing another continuance." United States v. Joos, 638 F.3d 581, 587 (8th Cir. 2011), cert. denied, 565 U.S. 1184 (2012); see United States v. Ware, 890 F.2d 1008, 1010 (8th Cir. 1989).

Here, trial of the case had been delayed by numerous defense motions for nearly two years. Ganter and his counsel had the discovery materials for over a year. Cf. United States v. Weisman, 858 F.2d 389, 391 (8th Cir. 1988), cert. denied, 489 U.S. 1071 (1989). Ganter did not explain why he had not assisted in trial preparation during that period and now needed "at least a few months" to prepare for a trial that would take less than two days to complete. The district court acted well within its discretion in denying Ganter's eve-of-trial motion for a lengthy continuance. Moreover, the district court had given an "explicit warning that a continuance would not be granted." United States v. Pollani, 146 F.3d 269, 272 (5th Cir. 1998). This decision did not coerce Ganter into relinquishing his right of self-representation. It simply denied him an unwarranted, indefinite trial delay.

### III. Jury Selection Issues

At trial, only two of the potential jurors, Nos. 27 and 39, were African-Americans. The district court struck both for cause because of their responses to voir dire questioning. Ganter's counsel acknowledged that the potential jurors likely "struck themselves," but objected to the total composition of the jury, citing <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).

On appeal, Ganter argues the district court erred in striking the two jurors. He frames the error as a violation of <u>Batson</u>, but the jurors were dismissed for cause and "<u>Batson</u> applies only to peremptory strikes." <u>United States v. Elliot</u>, 89 F.3d 1360, 1364-65 (8th Cir. 1996), <u>cert. denied</u>, 519 U.S. 1118 (1997). The argument on appeal was not clearly preserved in the district court. Indeed, when the district court suggested to counsel that prospective jurors 27 and 39 should be struck for cause, defense counsel said, "I agree [No. 27] struck herself for cause." We therefore conclude the issue as to No. 27 was waived on appeal. <u>See</u> <u>United States v. Klopfenstine</u>, 708 F.3d 1023, 1023-24 (8th Cir. 2013). However, the subsequent colloquy was ambiguous as to No. 39, and defense counsel clearly stated, "I want [No. 39] on the panel." So we will consider his strike for cause on the merits.

During voir dire, when No. 39 stated he had been stopped by law enforcement officers for driving on two occasions, government counsel inquired:

| | |
|---|---|
| McCarther: | Is there anything about those experiences that you think may make you judge an officer's credibility on the stand differently than you would judge any other citizen. |
| Venireperson 39: | Just depends on the situation. I can't say for certain. |
| McCarther: | . . . . I believe you previously stated that you have not met, nor do you know any of the officers that are going to be testifying in this case. Do you believe, having not known them, knowing nothing about their prior police officer |

|                   | experience, do you believe that you could judge them the same way that you judge anyone else when they get on the stand? |
|-------------------|---|
| Venireperson 39:  | Possibly. |
| McCarther:        | But you just don't know sitting here today? |
| Venireperson 39:  | Just can't tell. |

Later, defense counsel asked No. 39, is there "anything about the news media or the things that you've read or heard in the last few years that can impact your ability as a juror to sit and listen to the evidence fairly and impartially":

| Venireperson 39: | Yes to your question, yes. |
|------------------|---|
| Nouri:           | And I think you've already said . . . you've been the driving-while-black victim.  So you feel that you have some concerns in sitting on this jury because of that? |
| Venireperson 39: | . . . [Y]es . . . because of that stuff that is -- you're disappointed what you see. |
| Nouri:           | Can you expand on that, sir? |
| Venireperson 39: | Yes.  Just -- like just the thing in Ferguson and how that -- how all that went down is one of those instances because those things have an effect on me just being a black male, you know.  Those things have an effect on me.  So it could have an effect on how I see things. |
| Nouri:           | And when you say "have an effect," you mean an effect on whether or not you could fairly and impartially hear the evidence in this case and make a decision? |
| Venireperson 39: | I mean, I can listen and hear the evidence.  It just -- it's just -- when you see how, you know, things get one sided, you know, police getting off for doing certain crimes, stuff like that, and what you have, you know, the victim, or you know, nothing gets resolved with them, those things have an issue with me.  I know I can listen to the evidence, but, you know, not listen to everything entirely, I might have to -- how I feel about it. |

We review the district court's decision to strike a prospective juror for cause for abuse of discretion. "[A] district court is required to strike for cause any juror who is shown to lack impartiality or the appearance of impartiality, and absent abuse of discretion, we will not interfere with the District Court's determination of juror qualifications." Elliot, 89 F.3d at 1365. Ganter argues the district court erred in striking No. 39 because he was black "and had opinions about how the justice system was or was not fair to black defendants." He argues a for-cause strike must be based upon a showing of actual partiality growing out of the nature and circumstances of a particular case, not just a generalized feeling about the justice system in general.

Ganter conflates cases reviewing a refusal to strike and those agreeing to strike for cause. An appellant may argue that the district court erred by *refusing to strike* a potential juror who exhibited actual partiality -- "an inability to lay aside his or her impressions or opinions and render a verdict based on the evidence presented in court." Such a refusal infringes the appellant's right to trial by an impartial jury. Moran v. Clarke, 443 F.3d 646, 650 (8th Cir. 2006); see also United States v. Bascope-Zurita, 68 F.3d 1057, 1063 (8th Cir. 1995), cert. denied, 516 U.S. 1062 (1996). But where, as here, the appellant believes the district court erred in *striking* a potential juror, the appellant must convince the appellate court that the court had no "sound basis" for its decision. United States v. Lewis, 759 F.2d 1316, 1350 (8th Cir. 1985), cert. denied, 474 U.S. 994 (1985).

Here, we conclude the district court had a sound basis for striking juror No 39 for cause. "When a juror is unable to state that [he] will serve fairly and impartially despite being asked repeatedly for such assurances, we can have no confidence that [he] will 'lay aside' [his] biases or [his] prejudicial personal experiences and render a fair and impartial verdict." United States v. Evans, 272 F.3d 1069, 1079 (8th Cir. 2001) (quotation omitted); see Cravens v. Smith, 610 F.3d 1019, 1031-32 (8th Cir. 2010). There was no abuse of discretion.

## IV. Sentencing Issues

At sentencing, the district court assessed a four-level enhancement for use of a firearm in connection with a murder, resulting in an advisory guidelines sentencing range of 57 to 71 months on Count One and 57 to 60 months on Count Two. The government requested an upward variance to 120 months on Count 1 and a consecutive 55 months on Count 2 because of Ganter's violent history and underrepresented criminal history. After considering the 18 U.S.C. § 3553(a) sentencing factors, the fact that Ganter's unlawful possession resulted in a death, his long and violent criminal history, and his history of eluding police and obstructing legal process, the district court sentenced Ganter to 120 months imprisonment on Count 1 and a consecutive 60 months on Count 2.

On appeal, Ganter argues, citing United States v. Michael, 909 F.3d 990 (8th Cir. 2018), that the district court committed procedural error -- a mere talismanic recitation of the § 3553(a) factors -- and imposed a substantively unreasonable sentence. However, unlike the record on appeal in Michael, here it is evident the district court in fact weighed the § 3553(a) factors, the parties' sentencing memoranda, the PSR, Ganter's individual characteristics and history, and the seriousness of the offense. The court more than adequately explained its upward variance and did not fail to consider a relevant factor or give significant weight to an improper factor. There was no procedural error. See United States v. Feemster, 572 F.3d 455, 461 (8th Cir. 2009) (en banc). Nor did the district court impose a substantively unreasonable sentence. Though it imposed a significant upward variance and consecutive sentences, it fully explained why Ganter's deadly offense conduct and long, violent criminal history warranted a total sentence of 180 months imprisonment. See United States v. Barrett, 552 F.3d 724, 726-27 (8th Cir. 2009);

United States v. Azure, 596 F.3d 449, 456 (8th Cir. 2010) (reviewing consecutive sentences "only for reasonableness").

The judgment of the district court is affirmed.

_____